**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| SIMPLEAIR, INC., | § | |
| | § | |
| vs. | § | CASE NO. 2:09-CV-289-CE |
| | § | |
| APPLE INC., et al. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

## I.       INTRODUCTION

The court held a *Markman* hearing on June 17, 2011.  After considering the submissions and the arguments of counsel, the court issues the following order concerning the claim construction issues.

## II.      OVERVIEW OF THE PATENTS AND TECHNOLOGY

Plaintiff SimpleAir, Inc. ("Plaintiff") filed this suit against defendants Apple, Inc. ("Apple"), Disney Online ("Disney"), American Broadcasting Companies, Inc. ("ABC"), ESPN Enterprises, Inc. ("ESPN"), Handmark, Inc. ("Handmark"), Research In Motion Limited, and Research In Motion Corporation (collectively, "RIM"), alleging infringement of U.S. Patent Nos. 6,021,433 (the "'433 Patent"), 7,035,914 (the "'914 Patent"), 6,167,426 (the "'426 Patent"), and 6,735,614 (the "'614 Patent").

The '433 Patent and its child, the '914 Patent, are entitled "System and Method for Transmission of Data" and generally relate to methods of processing and transmitting internet-based content and real time notifications (e.g., breaking news alerts, financial news, e-mail notifications, sports scores, weather alerts, etc.) to remote computing devices.[1]  The Abstract of the '433 Patent explains the invention as follows:

---

[1]  The '433 and '914 Patents have substantially identical specifications, and therefore, for convenience purposes, all future citations will be to the specification of the '433 Patent.

A system and method for data communication connecting on-line networks with on-line and off-line computers. The present system provides for broadcast of up to the minute notification centric data thereby providing an instant call to action for users who are provided with the ability to instantaneously retrieve further detailed information. Information sources transmit data to a central broadcast server, which preprocesses the data for wireless broadcast. The notification centric portions of data are wirelessly broadcast to wireless receiving devices that are attached to computing devices. Upon receipt of the data at the computing device, the user is notified through different multimedia alerts that there is an incoming message. Wirelessly broadcasted URL's, associated with the data, are embedded in data packets and provide an automated wired or wireless connection back to the information source for obtaining detailed data.

'433 Patent at Abstract.

The '426 Patent and its child, the '614 Patent, are entitled "Contact Alerts for Unconnected Users" and generally relate to a computerized communication system for initiating contact with a user who is not currently connected to an interactive on-line communication network such as the internet.[2]  The Abstract of the '426 Patent explains the invention as follows:

Users access an on-line address service to register their name…and a unique contact address that may be used directly or indirectly to address a message over another communication network to an associated listening device. Once a potential user has registered his on-line identity and contact information, other users accessing the address service can then designate one of the listed names,…whereupon the computer hosting the address service will broadcast a message addressed to the identified person's associated listening device. Once the message is received, the listening device notifies the associated user by causing the user's computer to initiate an appropriate visual and/or audio alert display concerning the contact attempt. The user is then given an opportunity to connect to the on-line network and access a designated site to obtain further information about the attempted contact and/or to establish a direct connection with the interactive on-line activity from which the contact attempt originated, at the same time automatically launching any required browser or application software.

'426 Patent at Abstract.

## III.    GENERAL PRINCIPLES GOVERNING CLAIM CONSTRUCTION

"A claim in a patent provides the metes and bounds of the right which the patent confers

---

[2]    The '426 and '614 Patents have substantially identical specifications, and therefore, for convenience purposes, all future citations will be to the specification of the '426 Patent.

on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id*. A patent's claims must be read in view of the specification, of which they are a part. *Id*. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id*. "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*,

the court set forth several guideposts that courts should follow when construing claims.   In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude."   415 F.3d at 1312 (emphasis added) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).   To that end, the words used in a claim are generally given their ordinary and customary meaning.  *Id.*  The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Id.* at 1313.   This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to and intended to be read by others skilled in the particular art.  *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.*  Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument."  *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978).   Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims.  *Id.* at 1314-17.   As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims."  *Bates v. Coe*, 98 U.S. 31, 38 (1878).   In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir.

1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316.  Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the PTO understood the patent.  *Id.* at 1317.  Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings.  *Id.*  Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.  *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony.  The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24.  The approach suggested by *Texas Digital*—the assignment of a limited role to the specification—was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term.  *Id.* at 1320-21.  According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of

"focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

## IV.   TERMS IN DISPUTE

### a.   '433 and '914 Patent

#### i.   "a central broadcast server"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **"a central broadcast server":** one or more servers that are configured to receive data from a plurality of information sources and process the data prior to its transmission to a plurality of selected remote computing devices (where such transmission is not in direct response to a specific request from the user(s) of the remote computer devices) | **"a central broadcast server":** a central server that transmits to all receiving devices on its network |
| **"server":** one or more pieces of computer equipment and the software running on the equipment used to provide services for one or more other computers or computing devices | "server": computer system that serves other devices in a network |

The parties dispute the meaning of the term "a central broadcast server" and "server." Claim 1 of the '433 Patent, which is representative of the use of these terms, recites:

> A method for transmitting data to selected remote computing devices, comprising the steps of:
>
> > transmitting data from an information source to **a central broadcast server**;
> >
> > preprocessing said data at **said central broadcast server**, further comprising the step of:
> >
> > providing data to **servers** in **said central broadcast server**;
> >
> > parsing said data with parsers corresponding to said **servers**…

'433 Patent at Claim 1 (emphasis added).   The parties' primary dispute regarding the construction of "central broadcast server" centers on the appropriate construction of the term "broadcast."   Specifically, the parties dispute whether the term "broadcast:" (1) encompasses to concept of "push" methods of transmission; and (2) requires the "central broadcast server" to transmit to "a plurality of selected remote computing devices," as Plaintiff contends, or to "all receiving devices," as Defendants contend.

### 1.  Broadcast – Push Technology

With regard to whether the term "broadcast" encompasses "push" transmission technology, Plaintiff first argues that the term "broadcasting" in the context of sending on-line content means transmitting data to remote devices at the initiation of a central server or other network element (i.e., "pushing") rather than in response to a user requesting the data just before its transmission.   Plaintiff then argues that the term "broadcast" as used in the patents-in-suit means internet broadcasting – i.e., "push" methods for disseminating on-line information to remote users.   In support of its argument, Plaintiff notes that the '433 Patent explains that with prior systems, "users are required to search through the myriad of information, rather than having

the information come to them." '433 Patent at 2:6-19.  The specification goes on to explain that these shortcomings were "overcome by the present invention," which provides for a "sender initiated paradigm" in which "information sources" provide "real time data feeds" to a "central broadcast server" that processes data for the "broadcast of up to the minute notification centric information" sent "immediately or on a scheduled basis." *Id.* at 2:42-58, 6:61-7:3, 7:43-50.

Plaintiff further argues that the prosecution history of the patents-in-suit supports its contention that the patents are directed to "push" methods of transmission.  Specifically, during the prosecution of the '433 Patent application, the inventors distinguished the *Rossman* reference by explaining that it only transmitted data in response to a user's request to the server, whereas the '433 Patent's method required broadcasting data at the initiation of the server, not in response to a user request.  *See* Exhibit 6 at SA 872, attached to Dkt. No. 192.  In fact, the patentee emphasized that:

> a *fundamental* difference between the present invention and Rossman is that the present invention provides a one-way Internet address location communication system where Internet address locations are *broadcasts* [sic] *from a server to a plurality of receivers.* At no time are the Internet address locations "broadcast" to a user in response to a specific request from the user. In contrast, Rossman provides a user-initiated two-way Internet address location communication system where Internet address locations are initiated and sent by a *user to a server which then must access the information associated with the Internet address location and transmit it back to the user per the user's request.* The direction that the Internet address flows in the present invention is thus from the server to user, whereas in Rossman, the Internet address flows from the user to server.

*Id.* (emphasis in original); *see also id.* at SA 871 ("The present invention generates URLs at a *server* which are then broadcast to plurality of receivers. In contrast, Rossman requires a *user* to generate URL's which then must be sent … to a server").  Plaintiff thus argues that the patents use the term "broadcast" to refer to a transmission initiated by an information source or the

central broadcast server – i.e., a transmission that "is not in direct response to a specific request from the user(s) of the remote computer devices."

In response, Defendants argue that while prosecuting the patent underlying the '433 Patent, the patentees disclaimed the method of pushing data to a client system.  Defendants rely on the prosecution history surrounding the patentees' attempt to distinguish the *Rossman* reference.  According to Defendants, the patentee amended its application to add new claims directed to a method of pushing data to a client and in so doing sought to distinguish the *Rossman* reference using the explanation discussed above.  *See* Exhibit 6 at 15-21, attached to Dkt. No. 198.  The examiner, however, issued a restriction requirement, stating that the new claims were directed to "a method of pushing data to a client system."  *See* Exhibit 7 at 2-3, attached to Dkt. No. 198.  The examiner thus concluded that the claims were directed to an invention wholly distinct from that of the original claims.  *Id.*  In response, the applicants cancelled all the new claims, and never sought to add them back into any of the applications from which the patents-in-suit issued.  *See* Exhibit 8 at 1-2, attached to Dkt. No. 198.  The patentee explained that "in order to facilitate the immediate issuance [of the original claims of the patent application]..., the remainder of the pending claims [(including those directed to "push" technology)] have been canceled and presented in continuation applications."  *Id.*  As such, Defendants argue that the issued claims do not cover push technology.

The prosecution history must contain a "clear and unmistakable disavowal of scope" before it "may affect the construction of a claim term."  *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1211 (Fed. Cir. 2008).  Although the patentees did withdraw claims that the examiner concluded were directed to "push" technology, the patentees never explicitly stated that the remainder of their claims did not cover "push" technology.  In fact, all of the application claims,

both those issued and those withdrawn, included a "broadcast" limitation.  And in seeking to distinguish the *Rossman* reference the patentees relied on language that presently exists in the specification of the '433 Patent.  The patentees explained that *Rossman* does not indicate "that it can be modified to provide an Internet resource location which essentially operates as an 'alert' for a user to access further information if desired."  Rather, the patentees explained that *Rossman* "*teaches away* from the present invention by requiring a user to *formulate* an idea, *identify* an Internet resource location and then *initiate* a transmission protocol."  The patentees then cited to the following sections of the specification of the '433 Patent to support its contention that the present invention is distinguishable from *Rossman* because it is directed to "push" technology that "alerts" a user to access further desired information:

> In accordance with the present invention, the notification centric portions of that information that lives in an electronic medium is wirelessly broadcast on a nationwide basis to wireless receiving devices which are attached to personal computers or other computing devices. Upon receipt of the information at the personal computer, the user is notified through different multimedia alerts that there is an incoming message. Wirelessly broadcasted URL's, [sic] associated with the data, are embedded in data packets and provide an automated wired or wireless connection back to the information source for obtaining detailed data. '433 Patent at 2:53-64.

> Wirelessly broadcasted Uniform Resource Locator's (URL's) [sic] 22, associated with the data, are embedded in multimedia data packets and provide an automated wired or wireless connection or link 22 back to the information source 12 for obtaining detailed data. A network path to an information source 12 is identified by the URL having a known syntax for defining a network.  '433 Patent at 6:45-51.

> Referring to FIG. 1, the URL broadcast and hot links 22 back to the information source 12 is shown. In accordance with the present invention, very short notification centric messages such as news headlines from information sources 12, such as Internet, on-line services and other information providers, are transmitted to the computer 14 by wireless transmission. A user, from a computer 14, can make a wired connection 24 back to the information source 12 to obtain more detailed information. In accordance with the present invention, attached to each of the notification centric messages is a universal resource locator (URL) code 22 as well as related Internet address information…. *The present invention*

> *allows a user to pinpoint and locate the specific information the user was alerted to.* The user can thus hit one button which establishes the connection 24 and takes the user directly to the location where the information is located.  '433 Patent at 30:35-53.

The claims at issue here explicitly require that the computing device be instantaneously notified (i.e., alerted) of the receipt of data whether the computing device is on or off.  As such, there is significant support in the claim language itself, the specification, and the prosecution history for construing the claims of the '433 and '914 Patents to cover "push" technology.  *See, e.g.*, '433 Patent at 2:42-64, 6:45-51, 6:61-7:3, 7:43-50, 30:35-53.  In light of this, the court concludes that the patentees did not make a "clear and unmistakable disavowal of scope" during the prosecution of the '433 Patent.  *See Honeywell Intern., Inc. v. ITT Industries, Inc.*, 452 F.3d 1312, 1319 (Fed. Cir. 2006) (the Federal Circuit did not "assign much weight to the patent examiner's restriction requirement" because "the examiner did not construe the claim term … [at issue] … or determine its meaning in light of the written description.  He merely required that the applicant elect one aspect of his invention for prosecution without applying it to the specification."); *Colorquick, LLC v. Eastman Kodak Co.*, Civil Action No. 6:06–CV–390, 2008 WL 5771324 at *9-10 (E.D. Tex. June 25, 2008) ("…restriction requirements are, at best, of limited value as a claim construction tool.").

The court, however, is not convinced that the patentees intended to limit the claims of the patents-in-suit to cover only "push" methods of transmission.  Although the specification of the patents indicates that the invention is directed at "push" technology, the patentees knew how to draft claim language expressly limiting the scope of the invention to "push" transmission.  For example, as discussed above, during prosecution the applicants added claims requiring the following: "broadcasting said data including said Internet address location to a user in communication with one of said plurality of receivers, *wherein said Internet address location is*

11

*not broadcast in response to a request for said Internet address location by said user*."    *See* Exhibit 6 at 15, attached to Dkt. No. 198.  The applicants, however, withdrew these claims.  *See* Exhibit 8 at 1-2, attached to Dkt. No. 198.  Considering this, although the claims of the patents-in-suit encompass "push" technology, the court concludes that the patentees did not intend to limit the claims of the patents-in-suit to "push" methods of transmission.  Accordingly, the court rejects Plaintiff's proposed "(where such transmission is not in direct response to a specific request from the user(s) of the remote computer devices)" limitation.

### 2.   "Broadcast" – Transmit to "All"

The parties next dispute whether the term "broadcast" requires that the "central broadcast server" transmit to *all* receivers on its network, as Defendants contend, or only to *selected* remote computing devices, as Plaintiff contends.  Defendants argue that the patentees acted as their own lexicographer in defining "broadcast" when they made the following statement:

> The present invention unlike other wireless systems provides for a combination of broadcast, narrowcast, and pointcast transmission. That is, information can be transmitted wirelessly to everyone (broadcast), to a subset of users (narrow cast) or to one user (pointcast).

'433 Patent at 2:65-3:2.  According to Defendants, by use of the parenthetical, the inventors have specifically defined the term "broadcast" to mean transmitting wirelessly to everyone.

Although a patentee is free to be his own lexicographer, any special definition given to a word must be clearly set forth in the specification.  *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992).  In this case, the court is not convinced that the patentees acted as their own lexicographer in defining "broadcast" to  require transmission to all receivers.  In fact, the claim language itself indicates that the patentee did not intend to require broadcast to all receivers.  For example, the claims of the '426 and '614 Patents use "broadcasting" to refer to transmitting a message addressed to an individual user (not all users).   The claims recite

"designating a name registered on the address service" (which may be just one name), and then "broadcasting a message over the second communication network *to the registered address* associated with the selected name."   '426 Patent at Claim 1; '614 Patent at Claim 1. Furthermore, the claims of the '433 and '914 Patents recite a "central broadcast server" used for "transmitting data to *selected* remote computing devices" including the step of "transmitting preprocessed data to receivers communicating with said computing devices [i.e., selected computing devices]." '433 Patent at Claim 1; '914 Patent at Claim 1 (emphasis added). Accordingly, the claims expressly require that the data emanating from the "central broadcast server" is addressed to "selected" devices – not everyone.

Moreover, the specifications of all of the patents-in-suit support the contention that the "broadcast" need not go to all receivers.  For example, the specification of the '433 Patent describes in detail an embodiment where the "central broadcast server" is specifically designed to transmit its messages to a subset of subscribers, rather than to everyone, using "subscriber database 130 which is *utilized by the central broadcast server to determine 25 which subscribers receive which types of content*." '433 Patent at 8:15-25 (emphasis added).  Similarly, in the "Selection Addressing" section, the '433 Patent explains that data packets "are transmitted to the *central broadcast server* 34, where they are internally processed 25 before being wirelessly transmitted through a carrier 36 *to one or more personal computers 14*." *Id.* at 12:21-27 (emphasis added).  The "internal[] process[ing]" includes "selection addressing" whereby the data packets are addressed for transmission only to "selective receivers." *Id.*  Finally, the specification of the '426 Patent describes a service that "*broadcasts* messages to *individual subscribers* and *groups of subscribers*." '426 Patent at 3:6-7 (emphasis added).

Considering the intrinsic evidence presented above, the court concludes that the patentee did not clearly define "broadcast" to require that the "central broadcast server" transmit to all receivers on its network.  Rather, when the claims of all of the patents-in-suit (i.e., the '433, '914, '426, and '614 Patents) are read in light of the entire specification, the patentees used the term "broadcast" to require transmission to one or more selected remote computing devices.

### 3.   Other Disputes

The parties also disagree as to whether there can be "one or more" central broadcast servers.  Plaintiff argues that the correct construction of "a central broadcast server" and "server" must include its proposed "one or more" language.  Plaintiff relies on the Federal Circuit's decision in *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008), which explained that "[a]n indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" Furthermore, Plaintiff argues that both the claims and the specification of the '433  and '914 Patents confirms that one central broadcast server may consist of multiple servers (i.e., multiple pieces of hardware acting in concert with each other).  *See, e.g.*, '433 Patent at 7:43-46 ("a network of servers 33 in the central broadcast server 34"); *id.* at Fig. 1.;   *id* at Claim 1 ("providing data to servers in said central broadcast server").  In response, Defendants argue that Plaintiff's "one or more" limitation is inappropriate because the claim recites "a server," and then later refer to "said server" or "the server," which requires that all such references in the claim language are to the same server.

Defendants' contention that the "one or more" rule does not apply because the claim recites "a server," and then later refers to "said server" or "the server" is incorrect.  In *Baldwin Graphic*, the Federal Circuit explained that the "subsequent use of definite articles 'the' or 'said'

in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning."  512 F.3d at 1342.  As such, considering that the claims of every patent-in-suit are "comprising" claims and that both the specification and the claim language support the contention that one "central broadcast server" may consist of multiple servers, the court adopts Plaintiff's proposed "one or more" language for its construction of both "a central broadcast server" and "server."

The parties further dispute whether the "server" must serve other devices "in a network" as Defendants propose.  Defendants' proposed construction of "server" is a "computer system that serves other devices in a network."  Defendants, however, make no arguments in support of their proposed construction and Plaintiff's expert argues that a server need not be attached to a network at all, much less provide services to devices in a network.  Considering that Defendants fail to adequately support their proposed construction of "server," the court rejects Defendants' proposed construction.

The parties also dispute whether the term "central" as recited in "central broadcast server" needs to be construed.  Plaintiff's proposed construction gives meaning to the term "central," by specifying that the "central broadcast server" can: (1) "receive data from a plurality of information sources"; and (2) "process the data prior to its transmission to a plurality of selected remote computing devices."  Plaintiff argues that its proposed construction of "central" conforms to the use of the term in the specification of the '433 and '914 Patents.  The specification explains that "information sources…provide the information basis for outgoing broadcast," *id.* at 11:56-57, and the central broadcast server "operates effectively as network operations center," *id.* at 6:10-12, where "the information [is] consolidated," *id.* at 12:1-2, before its transmission to "one or more personal computers 14 or other computing sources via selective

receivers." *Id.* at 12:26-27.  Defendants, on the other hand, contend that "central" is a common English word that needs no construction.  The court, however, agrees with Plaintiff that defining "central" in accordance with the term's use in the '433 and '914 Patents will assist the jury in making its infringement determinations.  As such, given that Defendants do not contend that Plaintiff's proposed construction is incorrect, the court adopts Plaintiff's proposed "configured to receive data from a plurality of information sources and process the data prior to its transmission to a plurality of selected remote computing devices" language.

Finally, the parties dispute whether the "central broadcast server" must in fact perform the act of "broadcasting" or need simply to have the capability to do so.  Defendants' construction ("that transmits to all…") suggests the former interpretation, whereas Plaintiff's proposed construction ("configured to…") applies the latter.  The court concludes that Plaintiff's proposed construction accurately reflects the claim language.  First, no claim states that the central broadcast server actually performs "broadcasting."  Moreover, the "transmitting to receivers" step does not specify which component makes the transmission – it may be the central broadcast server, a transmission gateway (which may or may not be part of the central broadcast server), or something else.  As such, Defendants' language requiring that the "central broadcast server" actually "transmit" is contrary to the claim language.

### 4.  Conclusion

In conclusion, "a central broadcast server" means "one or more servers that are configured to receive data from a plurality of information sources and process the data prior to its transmission to one or more selected remote computing devices."  Furthermore, "server" means

"one or more pieces of computer equipment and the software running on the equipment used to provide services for one or more other computers or computing devices."[3]

### ii.  "an information source"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| one or more content or service providers that provide data to the central broadcast server, such as an online source of news, weather, sports, financial information, games, personal messages, or e-mails | a source of information to be transmitted to the central broadcast server<br><br>**Defendant RIM's Compromise Construction:** one or more content or <u>online</u> service providers that provide data to the central broadcast server, such an online source of news, weather, sports, financial information, games, personal messages, or e-mails |

Plaintiff argues that the court should construe "an information source" to mean "one or more content or service providers that provide data to the central broadcast server, such as an online source of news, weather, sports, financial information, games, personal messages, or e-mails."  Defendants Apple, Disney, ABC, ESPN, and Handmark, on the other hand, argue that the term should be construed to mean "a source of information to be transmitted to the central broadcast server."  And the RIM defendants offer the following compromise construction: "one or more content or <u>online</u> service providers that provide data to the central broadcast server, such an online source of news, weather, sports, financial information, games, personal messages, or e-mails."  The parties' dispute surrounding the correct construction of this term includes: (1) whether there are "one or more" information sources; (2) whether any "source of information" meets this limitation; (3) whether a service provider must be an *online* service provider; and (4) whether examples are useful.

Plaintiff first argues that the court should specify that there can be "one or more" information sources because the term is recited in open-ended claims containing the transitional

---

[3] The court notes that Defendants did not identify any alleged deficiencies in Plaintiff's proposed construction of "server" and did not contend that it was in any way incorrect.

phrase "comprising."   Defendants do not respond to this assertion or attempt to rebut the presumption that "*an* information source" in the context of the claims of the '433 and '914 Patents means "one or more" sources.   As such, the court adopts Plaintiff's "one or more" language.

Plaintiff next argues that the claims and specification of the '433 and '914 Patents show that what is claimed is not any source of information, but rather a category of electronic sources, namely content and service providers.   According to Plaintiff, the specification consistently and repeatedly identifies "information sources" as content or service providers (i.e., an entity or service that regularly provides information or services).   *See, e.g.*, '433 Patent at 7:43-46 ("information sources 12, such as the Internet, on-line services and other information sources, provide data feeds…[to] the central broadcast server" (emphasis added)); *id.* at Fig.1 ("Internet on-line services & information providers"); Fig. 12 (depicting an "information source on the Internet": a "content provider"); Fig. 13 (depicting the information source as "User's e-mail provider"); 12:33-36 ("[i]nformation from the content providers is first formatted… before being prepared for transmission.").   Furthermore, Plaintiff argues that its proposed examples of information sources (i.e., "an online source of news, weather, sports, financial information, games, personal messages, or e-mails") are all disclosed by the patent and will assist the jury. '433 Patent at 7:43-54; 21:32-39; Fig. 11 (showing categories of "viewers" used to display content from information sources).

Defendants do not address Plaintiff's argument that the claims are directed to specific sources of electronic information, such as content and service providers.   Further, Defendants do not contend that Plaintiff's proposed examples are inaccurate.   Rather, Defendants merely argue that Plaintiff's proposed construction somehow removes the requirement that the information

source be an actual source of information.  That argument is, however, unconvincing.  Plaintiff's proposed construction explains that the information sources "provide data" – i.e., they act as a source of information.  Rather, it is Defendants' proposed construction that merely rewords the claim language (i.e., "a source of information" to define "an information source"), as opposed to interpreting that language in light of the specification.  Consequently, the court rejects the following proposed construction: "a source of information to be transmitted to the central broadcast server."

The court, however, agrees with RIM that the patents refer to *online* services, as opposed to just any type of services.  *See, e.g.*, 1:50-56; 2:6-8; 2:36-39; 3:17-23; 5:20-24; 5:63-6:5.  As such, the court adopts the following construction of "an information source": "one or more content or online service providers that provide data to the central broadcast server, such as an online source of news, weather, sports, financial information, games, personal messages, or e-mails."

### iii.  "parsing said data with parsers"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **"parsing said data with parsers":**  using computer software to break or divide data received from an information source into components whose content or format can be analyzed, processed, or acted upon<br><br>**"Parsers":**  embedded in above proposal | **"parsing said data with parsers":**  categorizing said data with parsers for transmission to the information gateway based on the type of content<br><br>**"Parsers":**  computer software that categorizes |

Plaintiff urges the court construe "parsing said data with parsers" to mean "using computer software to break or divide data received from an information source into components whose content or format can be analyzed, processed, or acted upon."  Defendants, on the other hand, argue that: (1) the claimed "parsers" are "computer software that categorizes": and thus,

(2) "parsing said data with parsers" means "categorizing said data with parsers for transmission to the information gateway based on the type of content."

Plaintiff first argues that the specification states that "parsing" is performed by "software" on one or more servers within the central broadcast server. '433 Patent at Figure 2 (showing various parsers as part of the "software architecture"); *id.* at 7:61-8:2 ("real time data feeds … are provided to a network of servers 33 in the central broadcast server 34 … The data … is then respectively parsed by parsers."). Next, Plaintiff argues that the claim language and specification demonstrate that the '433 and '914 Patents use the term "parsing" according to the term's ordinary meaning – namely, to break or divide data into components. In response, Defendants contend that the patent describes "parsing" to mean breaking information up into categories based on the content of the data feed from the information source. *See* '433 Patent at 28:1-4.

Defendants correctly point out that the patents identify the fact that "users are required to search through a 'myriad of information' online and '[c]onsequently, information is often missed" as one of the problems with the prior art. '433 Patent at 2:11-13. Defendants, however, incorrectly assert that the patent's solution is parsers that categorize incoming information based on its type of content. The explicitly identified solution is to "hav[e] the information come to them [the users]." *Id.* at 2:11-12, 2:43-64. As for "parsers," the patents never say "parsers" are involved in categorizing and never even use "parser" in the same sentence with "categorize" (or with "sort" or any other synonym).

Defendants quote the following statement from the specification in support of their "categorizing" argument: "information is broken into logical information categories at the central broadcast server." *Id.* at 28:1-4. This statement, however, makes no mention of "parsers" and

Defendants fail to explain how the operation described has anything to do with parsers. Defendants also quote the patents' description of an embodiment in which "data … is then respectively parsed by parsers, such as the stock quote parser 106, weather parser 108, lotto parser 110 and mail parser 112." *Id.* at 7:67-8:14. Defendants characterize this as parsers categorizing the content (e.g., email from sports, news from weather). Defendants, however, are incorrect. This embodiment indicates the incoming information has already been separated into "weather," "lotto," etc. data feeds (see Fig. 2), and this already categorized information "is then respectively parsed by parsers." '433 Patent at 8:1-3. There is nothing in the specification stating that the parsers do any "categorizing." Accordingly, the court rejects Defendants' proposed constructions of "parsers" and "parsing said data with parsers."

The court concludes that Plaintiff's proposed construction accurately captures the specifications' description of "parsers" and the act of "parsing said data with parsers." The court, therefore, construes "parsing said data with parsers" to mean "using computer software to break or divide data received from an information source into components whose content or format can be analyzed, processed, or acted upon."

#### iv.  "a content manager for determining how said data is handled"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| one or more software programs (or a portion of a program) that can determine how different types of information received from an information source are handled or processed | a component that manages content, at least by determining the priority assigned to data<br><br>**Defendant RIM's Compromise Construction:** one or more software programs (or a portion of a program) that determine how different types of information received from an information source are handled or processed, at least by determining the priority assigned to data |

Plaintiff argues that the court should construe "a content manager for determining how said data is handled" to mean "one or more software programs (or a portion of a program) that can determine how different types of information received from an information source are handled or processed."  Defendants Apple, Disney, ABC, ESPN, and Handmark, on the other hand, argue that the court should construe the term to mean "a component that manages content, at least by determining the priority assigned to data."  And the RIM defendants offer the following compromise construction: "one or more software programs (or a portion of a program) that determine how different types of information received from an information source are handled or processed, at least by determining the priority assigned to data."

The primary dispute between the parties is whether the court should read a particular manner in which the content manager handles data into the construction of this phrase. Defendants contend that, although there are numerous methods of "determining how said data is handled," the critical method is by assigning priorities to different types of received data.  *See* '433 Patent at 8:26-47.  Defendants argue that their proposed construction does not limit the functionality of the content manager to only assigning priorities – rather, it merely highlights what the Defendants deem a "major" function of the content manager.  Defendants' proposed construction, however, imports a limitation from the embodiments into the claims.  Even despite

the Defendants' use of the word "at least," Defendants' construction would still require the content manager to perform a specific function that the specification characterizes as merely an exemplary embodiment.  *See id*.  As such, the court rejects Defendants' proposed "at least by determining the priority assigned to data" limitation because it improperly imports an embodiment into the claims.  *See Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

Defendants do not assert that Plaintiff's proposed construction is incorrect.  Rather, Defendants argue that Plaintiff's construction provides no meaningful guidance to the jury as to what the phrase means.  The court, however, disagrees with Defendants.  Plaintiff's construction first explains that the "content manager" is "one or more software programs (or a portion of a program)."  *See* '433 Patent at Figure 2 (depicting the content manager as part of the "software architecture").  It then explains that these software programs have the ability to "determine how different types of information *received from an information source* are handled *or processed*."  *See* '433 Patent at 8:26-27 ("the content manager 114 determines how different types of information are handled.").  In sum, Plaintiff's proposed construction accurately captures the function of the "content manager" without importing limitations into the claims.  Accordingly, the court construes "a content manager for determining how said data is handled" to mean "one

or more[4] software programs (or a portion of a program) that determine how different types of

information received from an information source are handled or processed."[5]

### v. "a transmission gateway for preparing said data blocks for transmission to receivers"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| one or more software programs (or a portion of a program) that can prepare the data blocks for their transmission to receivers and interface with other resources used to transmit the preprocessed data | a transmission gateway for encoding said data blocks in accordance with transmission protocols necessary for transmission to receivers |

Plaintiff argues that the court should construe the phrase "a transmission gateway for

preparing said data blocks for transmission to receivers" to mean "one or more software

programs (or a portion of a program) that can prepare the data blocks for their transmission to

receivers and interface with other resources used to transmit the preprocessed data." Defendants,

however, contend that the court should construe the phrase to mean "a transmission gateway for

encoding said data blocks in accordance with transmission protocols necessary for transmission

to receivers."

The parties' primary dispute is whether, as Defendants propose, "preparing said data

blocks for transmission to receivers" should be limited to "encoding said data blocks in

accordance with transmission protocols."  Plaintiff concedes that "preparing said data blocks for

transmission to receivers" can include the act of "encoding" the data blocks, but Plaintiff argues

---

[4] Defendants did not attempt to argue that Plaintiff's proposed "one or more" language is inappropriate and, therefore, failed to identify anything in the intrinsic record that would overcome the presumption that use of the indefinite article "a" means "one or more." *Baldwin Graphic Sys.*, 512 F.3d at 1342-43.

[5] The court's construction omits Plaintiff's proposed "can" determine language.  The claim language recites: "transmitting said data to a content manager for determining how said data is handled."  Read in the context of the other limitations, the court concludes that the claim language requires that the content manager actually determine how the data is to be handled.

that encoding the data blocks is merely one type of preparation performed by the transmission gateway.  For example, the specification of the '433 Patent identifies a number of processes performed by the wireless gateway 136 which creates data blocks for transmission:

> The data is then applied to the wireless gateway 136 which creates the data block, performs packetization, compression, encryption, and so forth to prepare the data block for transmission over the wireless broadcast network (step 119). The data block is then transmitted over the wireless broadcast network by the commercial carrier 26.

'433 Patent at 11:23-27; *see also id.* at 9:54-55 (the data "first goes through a process of packetization, encryption, compression and forward error correction methods, as described in detail below.").  Plaintiff contends that each of these potential uses of the "wireless gateway" are within the scope of "preparing said data blocks for transmission to receivers," and Defendants do not rebut this contention.  Furthermore, Defendants do not rebut Plaintiff's contention that the claims of the '433 and '914 Patents are not limited to "wireless" transmission and, therefore, the claimed "transmission gateway" need not prepare the data for "wireless" transmission in accordance with the "wireless gateway" embodiment.  *See* '433 Patent at 12:1-5 ("It will be understood by one skilled in the art that the information consolidated at the central broadcast server 34 may additionally be sent via a wired connection to a personal computer or computing device.").  Considering this, the court agrees with Plaintiff that Defendants are improperly attempting to limit the scope of the claimed "transmission gateway" to a preferred embodiment.  Accordingly, Defendants' proposed "encoding said data blocks in accordance with transmission protocols necessary for transmission to receivers" limitation is rejected.

Plaintiff's construction of "a transmission gateway" has two parts: (1) one or more software programs (or a portion of a program); and (2) that … interface with other resources used to transmit the preprocessed data."  The court agrees with Plaintiff that both pieces of its

proposed construction are correct.  First, the '433 Patent specification describes an embodiment that includes a type of transmission gateway ("wireless gateway 136"), and expressly states that this transmission gateway is part of the "software architecture."  *Id.* at Figure 2; *see also id.* at 7:57-60.  Accordingly, the court agrees with Plaintiff that "a transmission gateway" consists of one or more software programs, or a portion of a program.[6]  *See Baldwin Graphic*, 512 F.3d at 1342.  Second, the specification of the '433 and '914 Patents demonstrate that the "interface with other resources used to transmit" portion of Plaintiff's proposed construction is correct.  For example, Figure 2 shows "wireless gateway 136," which is one type of transmission gateway, serving as an interface between the central broadcast server and the communication resource of a wireless network.  Similar depictions are made for other embodiments.  '433 Patent at Figs. 3(a), 3(b), 3(c).  Furthermore, the specification states that the transmission gateway in this embodiment "provides the interface to" other transmission resources.  *Id.* at 22:8-9.  As such, the court agrees with Plaintiff that its proposed "interface with other resources used to transmit" limitation accurately captures the teachings in the specification.[7]

In conclusion, the court construes "a transmission gateway for preparing said data blocks for transmission to receivers" to mean "one or more software programs (or a portion of a program) that prepare the data blocks for their transmission to receivers and interface with other resources used to transmit the preprocessed data."[8]

---

[6] Defendants did not argue that this portion of Plaintiff's proposed construction was inaccurate.

[7] Defendants did not argue that this portion of Plaintiff's proposed construction was inaccurate.

[8] The court's construction omits Plaintiff's proposed "can" prepare language.  The claim language recites: "transmitting said data blocks from said information gateway to a transmission gateway for preparing said data block for transmission to receivers."  Read in the context of the claim as a whole, the claim language requires that the transmission gateway actually prepare the data blocks for transmission to receivers.

### vi.  "transmitting preprocessed data to receivers"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| transmitting data that has been preprocessed by the central broadcast server to receivers not in direct response to a specific request from the user of the remote computing device for the preprocessed data | No Construction Required |

Plaintiff argues that the phrase "transmitting preprocessed data to receivers" should be construed to mean "transmitting data that has been preprocessed by the central broadcast server to receivers not in direct response to a specific request from the user of the remote computing device for the preprocessed data."  Defendants, on the other hand, contend that this phrase needs no construction.

The parties' central dispute is whether the term "transmitting" should be construed to cover "push" methods of transmission.  The parties make the same arguments here that they made with regard to the appropriate construction of "central *broadcast* server" – that is, Plaintiff contends that the claim language, specification, and prosecution history make clear that the term "transmitting" does encompass "push" transmission, while Defendants argue that the patentees disclaimed "push" methods of transmission during prosecution of the '433 Patent.  These arguments were addressed above.

Plaintiff further supports its argument that the '433 and '914 Patents cover "push" transmissions by noting that the final element of Claim 1 of the '433 Patent requires that the remote computing device may be "off" at the time it is "instantaneously notif[ied] of the receipt of said preprocessed data."  Plaintiff contends that, in such a state, the remote device would not support an immediately prior request from the user for transmission of the data.  Accordingly,

Plaintiff surmises that the transmission of data to receivers must occur not in direct response to a specific request from the user for the transmitted data.

Defendants also provide additional support for their contention that the appropriate construction of "transmitting" should not include Plaintiff's proposed "not in direct response" limitation.  Defendants point out that a user can set preferences for broadcasts from the system.  According to Defendants, these user preferences directly impact when a transmission will occur, which contradicts Plaintiff's contention that the data transmission does not occur in direct response to a specific request from the user.  Preset delivery preferences, however, do not turn a push transmission into a transmission sent "in *direct* response to a specific request from the user."  As such, the court rejects this argument.

As discussed above, the court is not convinced that the patentees made a clear disavowal of "push" methods of transmission during the prosecution of the '433 Patent.  Furthermore, the court finds Plaintiff's contention that "preprocessed data" cannot be transmitted to a receiver communicating with a remote computing device "in direct response to a specific request from the user of the remote computing device" if the remote device is "off" to be convincing.[9]  '433 Patent at Claim 1.  Accordingly, the court reiterates its earlier conclusion that the claims of the patents-in-suit encompass "push" methods of transmission.  In accordance with the court's discussion above, however, the court also concludes that the claims of the patents-in-suit are not limited to "push" methods of transmission.  With these two rulings in mind, the court concludes that further construction of the phrase "transmitting preprocessed data to receivers" will not assist the jury in making its infringement determination.

---

[9] The court notes that Defendants did not respond to this argument.

### vii. "whether said computing devices are on or off"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| whether the computing devices are or are not actively connected to the Internet or another online service at the time the preprocessed data is received by the receivers | No Construction Necessary |

The phrase "whether said computing devices are on or off" appears only in the '433 Patent. Claim 1 of the '433 Patent is representative of the use of this phrase and recites: "transmitting preprocessed data to receivers communicating with said computing devices; and instantaneously notifying said computing devices of receipt of said preprocessed data *whether said computing devices are on or off*." '433 Patent at 32:66-67 (emphasis added). In contrast, Claim 1 of the '914 Patent recites: "transmitting preprocessed data to receivers communicating with said devices; and instantaneously notifying said devices of receipt of said preprocessed data *whether said computing devices are online or offline from a data channel associated with each device*." '914 Patent at 33:33-35 (emphasis added).

Plaintiff argues that the phrase "whether said computing devices are on or off" should be construed to mean "whether the computing devices are or are not actively connected to the Internet or another online service at the time the preprocessed data is received by the receivers." Defendants, on the other hand, argue that the phrase needs no construction. The parties' primary dispute is whether "on or off" means powered on or off (as Defendants contend) or on-line or off-line (as Plaintiff contends).

Plaintiff argues that its proposed "on-line or off-line" construction is supported by both the claims and the specification. First, Plaintiff contends that the specification of the '433 Patent supports its proposed on-line/off-line construction. The specification explains that "a remote

computer 14 can receive information instantly *even while it is off-line* (i.e., *not connected to the Internet or some other on-line service*). '433 Patent at 6:61-66 (emphasis added).

Second, Plaintiff contends that a construction of the final element of Claim 1 to mean the computing devices' power state is either "on or off" would render the dependent claims a physical impossibility.  In particular, in each instance where the dependent claims add additional limitations to the final element of Claim 1 (which contains the "on or off" limitation), those limitations require activities that occur on the remote computing device, such as providing an "alert which when activated allows display of data" (Claim 22), "a visual alert" (Claim 23), "an audio alert" (Claim 24), an "alert…related to the type of information present at [the] computing device," (Claim 25), and "displaying fly-in graphics and icon buttons to alert said user that new data has been received by said computing device" (Claim 27).  According to Plaintiff, these are actions that can occur when the computing device is powered "on" but not when it is powered "off."  As such, Plaintiff argues that the methods claimed by these dependent claims would be physically impossible if Claim 1 is construed to require an instantaneous notification to the computing device both when the device is powered on and when it is powered off.

In response, Defendants argue that during prosecution of the '914 Patent, the applicants confirmed that "on or off" means powered on or off, and not online or offline as Plaintiff suggests.   At the time, Claim 1 of the '914 Patent required the computing devices to be notified "whether…[they]…are on or off."  *See* Exhibit 9 at 62, attached to Dkt. No. 198.  Based on that claim language, the examiner rejected the claims in view of U.S. Patent No. 5,043,721 (the "*May* reference").  *See* Exhibit 10 at 6-8, attached to Dkt. No. 198.   In response, the applicants attempted to distinguish *May* as follows:

> it is alleged that *May* discloses "means for notifying said computing devices
> wherein said remote computing devices are notified of receipt of said

preprocessed data whether said computing devices are on or off." In fact, the cited portion of *May* states that "the microprocessor can be programmed to "wake up" a turned off portable computing device upon the reception of a page signal." Thus, *May* only discloses that the portable computing device *can be woken up, i.e. turned on, upon receipt of a page signal*…. The claimed invention *does not require the remote computing device to be turned on upon receipt of preprocessed data, whereas May does require the remote computing device to be turned on upon receipt of preprocessed data.* In one exemplary embodiment, the remote device could be notified of receipt of preprocessed data by a separate interface system that does not require the device to be turned on, such as that shown in Figure 11 of the application.

*See* Exhibit 5 at 15, attached to Dkt. No. 198.   According to Defendants, the patentees' statements make it clear that the computing device did not need to be "turned on," but could be "turned off" to receive data, unlike the prior art.   As such, Defendants argue that these statements are consistent with the ordinary meaning of "on" and "off" as meaning powered on or off,  but inconsistent with the concepts of online and offline, since a computer that is offline may still be "on."

The court agrees with Defendants that, when the language of the Claim 1 of '433 Patent is viewed in light of the prosecution history statements identified above, the patentees intended the words "on or off" to mean powered "on or off."   In distinguishing the *May* reference, the patentees explained that *May* merely disclosed a microprocessor with the ability to wake up a sleeping computer upon receipt of a page signal, whereas the microprocessor claimed in the '433 and '914 Patents do not have to be "turned on" at all to receive preprocessed data.   The court agrees with Defendants that these statements make clear that the patentee used the term "on or off" consistent with the ordinary meaning of "on" and "off" – that is, powered on or off.   As such, the court rejects Plaintiff's proposed construction.   Furthermore, considering that the court has concluded that the patentees used the terms "on" and "off" in accordance with their ordinary

meaning, the court agrees with Defendants that the phrase "whether said computing devices are

on or off" needs no further construction.

> ### viii.   "whether said computing devices are online or offline from a data channel associated with each device"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| **"whether said computing devices are online or offline from a data channel associated with each device":**  whether the remote computing devices are or are not actively connected via the Internet or another online service to a data channel associated with each computing device at the time the preprocessed data is received by the receivers.  A device is not online to an associated data channel merely because it is able to receive data transmissions from the central broadcast server.<br><br>**"data channel":**<br>  -  Proposal 1: one or more communication channels or paths for accessing or viewing a category or subcategory of information that is provided by an information source over a communications network<br>  -  Proposal 2: one or more communication channels or paths for transmitting data over a communications network | **"whether said computing devices are online or offline from a data channel associated with each device":**  whether said devices are online or offline from a network connection associated with each device.<br><br>**"data channel":**  No Construction Required |

Claim 1 of the '914 Patent recites: "instantaneously notifying said computing devices of

receipt of said preprocessed data *whether said computing devices are online or offline from a*

*data channel associated with each device.*"  '914 Patent at 33:33-35 (emphasis added).  The

parties dispute both the meaning of "data channel" and the meaning of the phrase "whether said

computing devices are online or offline from a data channel associated with each device."

### 1.  "data channel"

With regard to "data channel," the parties' central dispute is whether the "data channel" is a "communication channel or path" (as Plaintiff contends) or "a network connection" (as Defendants contend).  Although the term "data channel" is not mentioned in the '914 Patent's specification, Plaintiff argues that the specification confirms its conclusion that the term "data channel" is used in accordance with its ordinary meaning within the field of Internet broadcasting – that is, that a "data channel" is a broadcast channel.  The specification explains that "on-line services and other information sources, provide data feeds, including real time data feeds" to the central broadcast server regarding, for example, "news, sports, and financial stories."  '433 Patent at 7:44-54.  "[A] user can register and subscribe to receive broadcasts" of these data feeds from the central broadcast server, which maintains a "subscriber database…to determine which subscribers receive which types of content."  *Id.* at 8:20-25.  The specification explains that the user is able to specify "preferences at information category or specific content levels" and can even select "subcategories of information within a particular information category."  *Id.* at 21:21-32.  Thus, when data for a particular feed is available, it is "broadcast to the preferred viewer" application on the user's remote computing device.  *Id.* at 26-15-17.  Plaintiff argues that this description of the invention makes clear that "a data channel" was used in the patents with the same meaning that it has as a term of art in the field of Internet broadcasting: "one or more communication channels or paths for accessing or viewing a category or subcategory of information that is provided by an information source over a communications network."

Defendants, on the other hand, contend that "data channel" should be construed to mean "a network connection."  In support of their proposed construction, Defendants devote two pages

of their brief to quoting the specification's use of the word "connection" or "network."  For

example, defendants quote the following language:

> This allows the user, by clicking on an icon that is embedded in the message, *to make a wired or wireless connection 24*, either through a *modem, TC/IP or LAN-type connection*, and *automatically establish a link back to the information source 12*. ('433 Patent at 30:66-31:3)

> Wirelessly broadcasted Uniform Resource Locator's (URL's) [sic] 22, associated with the data, are embedded in multimedia data packets and provide an automated wired or wireless *connection or link 22 back to the information source 12* for obtaining detailed data. *A network path to an information source 12* is identified by the URL having a known syntax for defining a network. ('433 Patent at 6:45-51)

> A modem enables communication *over a network* to other information sources or computers. ('433 Patent at 2:42-46).

According to Defendants, these specification statements, as well as others, confirm that the

"associated data channel" of the computing device is a "network connection" between the

computing device and the Internet online services.  Defendants, however, are incorrect.  At most,

these statements establish that the "data channel" is a communication channel or path *over* a

network – not a connection *to* a network.   In fact, the specification sections relied on by

Defendants actually support Plaintiff's contention that the "data channel" is a "communication

channel or path for accessing or viewing a category or subcategory of information."

Considering this, the court rejects Defendants' proposed construction of "data channel"

and adopts Plaintiff's first proposed construction.  Furthermore, the court rejects Defendants'

contention that the phrase "a data channel" means "one" data channel.  As the Federal Circuit

has explained, the maxim that "'a' or 'an' can mean 'one or more' is best described as a rule,

rather than merely as a presumption or even a convention.  The exceptions to this rule are

extremely limited: a patentee must 'evince[] a clear intent' to limit 'a' or 'an' to 'one.'"  *Baldwin

Graphic Sys.*, 512 F.3d at 1342-43.  Defendants have failed to identify anything in the intrinsic

record indicating that the patentees clearly intended to limit "a data channel" to "one" data channel.  Accordingly, the court construes "data channel" to mean "one or more communication channels or paths for accessing or viewing a category or subcategory of information that is provided by an information source over a communications network."

### 2. "whether said computing devices are online or offline from a data channel associated with each device"

Plaintiff contends that the court should construe the phrase "whether said computing devices are online or offline from a data channel associated with each device" to mean "whether the remote computing devices are or are not actively connected via the Internet or another online service to a data channel associated with each computing device at the time the preprocessed data is received by the receivers.  A device is not online to an associated data channel merely because it is able to receive data transmissions from the central broadcast server."  Defendants' proposed construction, on the other hand, merely incorporates its proposed construction of "data channel" and makes no other changes to the claim language.  Considering that, as discussed immediately above, the court rejects Defendants' proposed construction of "data channel," the court also rejects Defendants' proposed construction of "whether said computing devices are online or offline from a data channel associated with each device."

The specification of the '914 Patent states that an "advantage of the present invention is that a remote computer 14 can receive information instantly--even while it is *off-line (i.e. not connected to the Internet or some other on-line service)*. Thus, a user has the ability to receive 'on-line' information even when the user is 'off-line'."  '914 Patent at 6:61-64.  Plaintiff's proposed construction, however, urges the court to construe the "online or offline" language to mean "whether the … devices are or are not actively connected via the Internet or another online service to a data channel associated with each computing device…."  Having carefully reviewed

the intrinsic record, the court concludes that the first portion of Plaintiff's proposed construction accurately captures the '914 Patent's disclosures regarding this phrase. *See, e.g.*, '914 Patent at 2:51-54 (the present invention … provides a system and method for data communication *connecting on-line networks* with *on-line and off-line computers*."). 3:58-67 ("In accordance with another embodiment of the invention, the information provided from the information sources … can also be sent simultaneously *via a wired connection* to the same personal computers and computing devices having *Internet/World Wide Web (WWW) access (direct or via on-line service providing Internet and Web access).*)"

The second portion of Plaintiff's proposed construction clarifies that "a device is not online to an associated data channel merely because it is able to receive data transmissions from the central broadcast server."  Plaintiff argues that any construction of the final element of Claim 1 of the '914 Patent that would deem a remote computing device "online…from a data channel" merely because that device is able to receive transmissions from the central broadcast server would render the claim element nonsensical.  The claim requires that preprocessed data is transmitted to "receivers communicating with [the remote computing] devices" and the computing devices are "instantaneously notif[ied]" of this "receipt."  Furthermore, the claim requires that this notification is made "whether the remote computing device is online or offline from a data channel."  If "online…from a data channel" were construed such that a device is online merely because it is able to receive transmissions from the central broadcast server, there would never be a notification "of receipt" made to a device that is "offline from a data channel."  As such, Plaintiff argues that it is necessary to clarify that "a device is not online to an associated data channel merely because it is able to receive data transmissions from the central broadcast server."

In response, Defendants argue that the Plaintiff's proposed clarification is incorrect because the computing devices are not connected to the broadcast network – rather, the receiver is.  According to the claim language and the specification, notifications are broadcast to the receiving device, which notifies the computing device that information is available on the Internet.  Defendants' argument is rejected.  It makes no difference that the computing device receives broadcasts indirectly.  As Plaintiff points out, the mere ability of a computing device to receive transmissions from the central broadcast server (whether directly or indirectly via a receiver) cannot mean that the computing device is "online to a data channel," because that would render the "instantaneous notification" of both online and offline devices nonsensical.  Considering this, the court agrees with Plaintiff that its proposed "a device is not online to an associated data channel merely because it is able to receive data transmissions from the central broadcast server" language will reduce juror confusion and assist the jury in making its infringement determinations.

In conclusion, the court construes the phrase "whether said computing devices are online or offline from a data channel associated with each device" to mean "whether the remote computing devices are or are not connected via the Internet or another online service to a data channel associated with each computing device at the time the preprocessed data is received by the receivers.  A device is not online to an associated data channel merely because it is able to receive data transmissions (directly or indirectly)[10] from the central broadcast server."

---

[10] During the claim construction hearing, Plaintiff agreed to the addition of this language.

### b.  '426 and '614 Patents

#### i.  "a method of connecting users to a first communication network"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| **"a method of connecting users to a first communication network":**  no construction of entire preamble needed; construction of "a first communication network" below | **"a method of connecting users to a first communication network":**  a method for a connected user to invite an unconnected user to meet on the first communication network |
| **"user":** no construction necessary | **"user":**  a natural person |

The preambles to Claim 1 of the '426 and '614 Patents recite "[a] method for connecting users to a first communication network, comprising."  Plaintiff contends that the phrase "a method of connecting users to a first communication network"  and the term "users" need not be construed because it is included in the preamble of these claims.  Defendants, on the other hand, argue that this phrase must be construed because the preamble recites a requirement that is fundamental to the characteristics of the invention – i.e., a method for "connecting users."

According to Defendants, the fundamental invention of the '426 and '614 Patents is a method of broadcasting contact messages intended to invite unconnected users, which Defendants define as natural persons, to engage in an on-line interactive activity – that is, user-to-user invitations.   The patents, however, expressly teach that broadcast messages are not limited to such user-to-user invitations:

> As currently contemplated, the wireless paging service 22 broadcasts not only contact attempt information from address service 20, but also other types of broadcast, narrowcast and pointcast messages from other Internet services 18 (for example, news headlines, stock prices, e-mail, etc), which are combined, encrypted, encoded and packetized prior to transmission and which are received, decrypted, decoded, assembled into messages and filtered, as described in the referenced PCT application.

'426 Patent at 3:26-30.  Considering this, the court rejects Defendants' attempt to limit the scope of the invention to user-to-user invitations.

Furthermore, Defendants argue that the court should construe the term "user" to mean "a natural person."  Having rejected Defendants' argument that the patents-in-suit are limited to user-to-user invitations, the court further rejects Defendants' proposed "a natural person" construction.  Having carefully reviewed the use of this term in the claim language, the court agrees with Plaintiff that this term needs no construction.

Finally, Defendants argue that the preamble provides antecedent basis for the term "first communication network" and that, therefore, the preamble must be treated as a claim limitation. Whether to treat a preamble term as a claim limitation is "determined on the facts of each case in light of the claim as a whole and the invention described in the patent." *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358-59 (Fed. Cir. 2010).  Generally, "the preamble does not limit the claims." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002). Nonetheless, the preamble may be construed as limiting if it provides antecedent basis for later claim elements. *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1367-77 (Fed. Cir. 2005). Here, the court agrees with Defendants that the preamble provides antecedent basis for the term "first communication network."  The court will address the appropriate construction of the preamble term "first communication network" in the next section.

### ii.   "first communication network" and "second communication network"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **"a first communication network"**: one or more communication networks that can be used to conduct an interactive activity, such as the Internet or a network that is accessed over the Internet | **"a first communication network"**: network that is used for conducting an interactive activity |
| **"a second communication network"**:  one or more communication networks other than the first communication network | **"a second communication network"**:  network for receiving messages identifying an interactive activity that is independent from the first communication network |
| **"communication network"**: a collection or group of two or more interconnected communication resources used to transfer or exchange information | **"communication network":** No construction needed. But if the court decides that construction is needed, Defendants propose: a collection or group of two or more interconnected communication systems used to transfer or exchange information |

The parties dispute the appropriate construction of "communication network," "first communication network," and "second communication network."  Claim 1 of the '426 Patent is representative of the use of these terms and recites:

A method for connecting users to *a first communication network*, comprising:

provising an address service connected to the *first communication network* on which a user may register a name and an associated address on a *second communication network*;

using the *first communication network* to access the address service;

designating a name registered on the address service;

in response to the designation of said registered name, automatically broadcasting a message over the *second communication network* to the registered address associated with the selected name, said message identifying an interactive activity to be conducted over the first communication network;

using a receiving device *not connected to the first communication network* to receive said message….

The parties' primary dispute with regard to these terms centers on whether the "first communication network" and the "second communication network" must be wholly independent networks as Defendants contend.  Defendants argue that the court should construe "second communication network" to mean a "network for receiving messages identifying an interactive activity that is independent from the first communication network."  According to Defendants, the claim language itself requires that the communication networks be independent.  The claims require broadcasting over the second communication network a "message identifying an interactive activity," and also requires that such activity is "to be conducted over the first communication network."  *See, e.g.*, '426 Patent at Claim 1.  As such, Defendants argue that the claims require two independent communication networks with two different functions. Furthermore, the claims require "broadcasting a message over the second communication network," but also require "using a receiving device not connected to the first communication network to receive said message."  According to Defendants, only a network that is wholly independent of the first communication network would be "not connected" to that network. Defendants thus argue that the language of the claims can only be satisfied by two networks that are completely independent of one another.

In response, Plaintiff argues that the Defendant is seeking to import a preferred embodiment into the claims by requiring that the communication networks be independent from one another.  Plaintiff admits that the specification describes an embodiment wherein the "the listening device [(a type of receiving device not recited by claim 1)] preferably is connected to a wireless communication network that is independent of the on-line communication network." '426 Patent at 2:6-10.   Plaintiff, however, argues that it is inappropriate to import this embodiment into the claims by means of the construction of "second communication device."

Furthermore, Plaintiff argues that Defendants' contention that only a network that is wholly independent of the first communication network would be "not connected" (as required by Claim 1) to the first communication network is incorrect.  According to Plaintiff, one network (such as a cellular network) can be used to access another (such as the Internet).  Thus, two networks can be distinct without being wholly independent and a device may have a connection to one but not the other.

The court finds Plaintiff's argument that two networks can be distinct without being wholly independent convincing.  Indeed, Figure 1 of the '426 and '614 Patents depict the first communication network and the second communication network as being connected via the Internet connection 16 and communication line 30:



'426 Patent at Figure 1.  Considering this, and the fact that Defendants cite to nothing in the intrinsic record specifically requiring that the two networks be "independent," the court rejects Defendants' proposed "independent from" limitation.

The parties' also dispute the correct construction of "communication network."  Plaintiff argues that this term should be construed in accordance with its ordinary meaning – that is, "a

collection or group of two or more interconnected *communication resources* used to transfer or exchange information."   Defendants, on the other hand, argue that "communication network" needs no further construction, but, if the court determines that construction is appropriate, the court should construe the term to mean "a collection or group of two or more interconnected *communication systems* used to transfer or exchange information." *See, e.g.*, '426 Patent at 1:24-26 ("The present invention relates generally to *communication systems*, and more particularly to both wired and non-wired data transmission *communication systems*.").   Having reviewed the extrinsic dictionary definitions relied on by Plaintiff in light of the intrinsic record, the court concludes that term "communication network" in the patents-in-suit is used in accordance with its plain and ordinary meaning.   As such, the court agrees with Defendants that this term should be construed in accordance with its plain and ordinary meaning and needs no further construction.

In conclusion, the court adopts the following constructions: (1) "a first communication network" means "one or more[11] communication networks that can be used[12] to conduct an interactive activity;" (2) "a second communication network" means "one or more communication networks other than the first communication network."

---

[11] Defendants produced no evidence that the patentees "'evinced a clear intent' to limit 'a' or 'an' to 'one.'" *Baldwin Graphic*, 512 F.3d at 1342.

[12] The court rejects Defendants' footnote argument that Plaintiff's "can be used" language is inappropriate because Plaintiff will be required to prove that the accused systems are actually used in the manner recited in the claims to prove infringement.   Plaintiff will be required to prove only that the accused systems perform the steps actually recited in the claims as construed by the court.   In the context of the claims, it would be inappropriate for the court to incorporate an addition limitation requiring that the "first communication network" actually be "used" for conducting an interactive activity because the claim language of the '614 and '426 Patents already require "using" the first communication system.

### iii.  "designating a name registered on the address service"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| specifying or selecting a name registered on the address service | selecting or entering on the address service a registered name |

Plaintiff argues that "designating a name registered on the address service" should be construed to mean "specifying or selecting a name registered on the address service." Defendants, however, argue that the phrase should be construed to mean "selecting or entering on the address service a registered name."  The parties' dispute centers on two issues: (1) whether "designating" should be construed to mean "specifying or selecting" (as Plaintiff contends) or "selecting or entering" (as Defendants contend); and (2) whether designation must occur "on the address service" (as Defendants contend).

First, the court agrees with Defendants that "designating" means "selecting or entering" a name.  In the Summary of the Invention, the claimed designation is described as including either "selecting or entering":

> Once a potential user has registered his on-line identity and contact information, other users accessing the address service can then designate one of the listed names, either by selecting the name from a display list of registered names (if all registered names are displayed) or by entering the designated name onto an appropriate form….

'426 Patent at 1:65-2:3; *see also id*. at 4:55-67.  Furthermore, the figures and exemplary embodiment discuss a user's ability to enter or re-enter a name that may be misspelled.  *Id*. at 5:11-15 ("If a registered name is not already in the data base that corresponds to the screen name entered in the contact attempt…the user is given another chance to re-enter the screen name of the person being contacted."); Figure 4B ("Sorry, the screen name you have entered is not currently in our database … Please try again with a different spelling or capitalization.").  As

such, the court adopts Defendants' proposed "selecting or entering" language because it captures the broad phraseology used by the inventors.

Second, Defendants argue that the specification clarifies that the claimed activity of "designating a name" must occur "on the address service." *Id.* at 1:49-2:10. The claim language, however, does not require this and, therefore, the court rejects Defendants' attempt to read an embodiment into the claims.

In conclusion, the court construes the phrase "designating a name registered on the address service" to mean "selecting or entering a name registered on the address service."

### iv. "broadcasting"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| transmitting or sending | transmitting to all receiving devices on the second communication network |

The parties do not dispute that "broadcast" should be construed consistently in all of the patents-in-suit and the parties make essentially the same arguments with regard to the appropriate construction of "broadcast" as used in the '426 and '614 Patents as they made regarding the construction of the term in the '433 and '914 Patents. As discussed above, the court has construed the term "broadcast" as used by the '433 and '914 Patents to refer to transmissions made at the initiation of a server, rather than in response to a specific request from a user for the transmitted data – that is, the court has concluded that the term "broadcast" covers methods of push transmission. Furthermore, the court has rejected Defendants' proposed transmitting to "all" limitations. As such, considering that Plaintiff represents that its proposed "transmitting or sending" construction is meant to capture methods of push transmission, the court adopts Plaintiff's proposed construction. Accordingly, the court construes "broadcast" to mean "transmitting or sending."

### v.  "interactive activity"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| activity involving the interaction of a user with another user, a service, or a service provider | an activity in which users meet and participate together over the first communication network |

The parties' dispute with regard to the term "interactive activity" is whether such activities are limited to user-to-user interactions online.  As discussed above, the court has rejected Defendants' argument that they are, and therefore, the court rejects Defendants' proposed construction of "interactive activity."

The court concludes that Plaintiff's proposed construction accurately captures the full scope of the term "interactive activity" when read in light of the specification.  As discussed above, the specification of the '426 and '614 Patents explains that broadcast messages may include "not only contact attempt information" (e.g., requests to chat or play a game online with another user), "but also other types of…messages from other Internet services 18 (for example, news headlines, stock prices, e-mail, etc.)."  '426 Patent at 3:26-30.  According to Plaintiff, such "other types" of messages would identify an interactive activity between the recipient user and the Internet service – for example, one in which the user submits a request to the service and receives additional information relating to the message.  Defendants do not argue that Plaintiff's proposed examples are incorrect.  As such, the court adopts Plaintiff's proposed construction – that is, "interactive activity" means "activity involving the interaction of a user with another user, a service, or a service provider."

### vi.  "receiving device" and "interactive device"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| **"receiving device"**:<br>- Proposal 1:  no construction needed<br>- Proposal 2:  component or machine that can receive messages over the second communication network<br><br>**"interactive device"**:<br>- Proposal 1:  no construction needed<br>- Proposal 2:  component or machine that can access the first communication network and be used to carry out an interactive activity | **"receiving device"**:  a device for receiving messages over the second communication network and not for conducting interactive activities<br><br>**RIM's Proposed Compromise Construction:** a device that receives messages over the second communication network<br><br><br>**"interactive device"**:  a device for conducting interactive activities over the first communication network and not for receiving the message over the second communication network<br><br>**RIM's Proposed Compromise Construction:** a device that accesses the first communication network and be used to carry out an interactive activity |

The parties dispute the appropriate construction of both "receiving device" and "interactive device."  Claim 1 of the '426, which is representative of the use of these terms, recites:

> A method for connecting users to a first communication network, comprising:
>
> ….
>
>> in response to the designation of said registered name, automatically broadcasting a message over the second communication network to the registered address associated with the selected name, said message identifying an interactive activity to be conducted over the first communication network;
>>
>> using a *receiving device not connected to the first communication network* to receive said message;
>>
>> in response to the reception of said message by said receiving device, automatically generating a user prompt to commence the identified interactive activity; and

in response to a positive acknowledgment of said user prompt, automatically *connecting an interactive device to the first communication network* and commencing the identified interactive activity.

## 1. "Receiving Device"

The parties' primary disputes with regard to the appropriate construction of "receiving device" are: (1) whether the "receiving device" is limited to the function of "receiving" broadcast messages; and (2) whether the "receiving device" must be a separate, standalone machine, as opposed to a component within a machine.

First, defendants Apple, Disney, ABC, ESPN, and Handmark argue that the claim language compels the conclusion that the "receiving device" cannot be used to conduct interactive activities, and therefore, the court should include its proposed "not for conducting interactive activities" limitation in the construction of "receiving device." Claim 1 of the '426 Patent requires that the receiving device "not [be] connected to the first communication network" and also requires "automatically connecting an interactive device to the first communication network and commencing the identified interactive activity." According to these defendants, since the receiving device is claimed to "not [be] connected to the first communication network" (i.e., the network over which the interactive activity must occur), the receiving device necessarily cannot be "for conducting interactive activities." In response, Plaintiff argues that because Claim 1 of the '426 and '614 Patents is a "comprising" claim, one may practice the claims by using a "receiving device" that not only receives a message over the second communication network, but does more than that (e.g., carries out interactive activities). As such, considering that defendants Apple, Disney, ABC, ESPN, and Handmark's proposed construction does not allow for this, Plaintiff argues that the construction must be rejected.

The claim language does not state that the "receiving device" cannot perform other functions, such as conducting interactive activities.  Furthermore, the fact that the "receiving device" is on a different network than the "interactive device," does not necessarily mean that the "receiving device" is incapable of performing interactive functions.  As Plaintiff pointed out, Claim 1 of the '426 and '614 Patents is a comprising claim.  As such, it is inappropriate for the court to limit the function of the receiving device to merely "receiving" messages.  The court, therefore, rejects defendants Apple, Disney, ABC, ESPN, and Handmark's proposed "not for conducting interactive activities" limitation.

Second, Plaintiff contends that the a "device" can be a standalone machine or a component within a machine.  For example, Figure 1 of the '426 Patent shows "an exemplary system for implementing the present invention" and depicts a "personal computer 10" and a separate, but connected, "receiver 28."  '426 Patent at 12:63-65.  This demonstrates that an interactive device and a receiving device may be separate, standalone machines.  The specification also states, "the personal computing device and the receiver could be implemented in the form of an intelligent handheld personal communicator."  '426 Patent at 5:31-33.  Plaintiff contends that because a "computing device" can be "implemented in the form of an intelligent handheld personal communicator," this shows that a device can also form part of another machine and need not stand alone.

In response, Defendants argue that the embodiments on which Plaintiff relies for the contention that a "device" can be a component within a machine are not captured by the claim language.  Defendants, however, fail to explain how the language of the claims necessitates the conclusion that a "device" must necessarily be a standalone machine.  Defendants, however, do argue that even if "device" is found to encompass a component within a machine, the asserted

claims require that the "receiving device" and "interactive device" must be separate. To support this argument, Defendants again rely on their contention that the claim language requires that these two devices are distinct and separate because both cannot be "connected to the first communication network" and "not connected to the first communication network." As discussed above, the court rejects this argument. The court also rejects Defendants' contention that the claim language does not capture embodiments in which a "device" is a component of a machine as opposed to a standalone machine.

In conclusion, the court construes "receiving device" to mean a "component or machine than can receive messages over the second communication network."

### 2.  "Interactive Device"

The parties' dispute with regard to the appropriate construction of "interactive device" centers on the same issues discussed immediately above. As discussed above, the court has concluded that the claim language requires neither that the "receiving device" perform only the function of receiving nor that the "interactive device" perform only the function of conducting interactive activities. Furthermore, the court has concluded that a "device" need not be a standalone machine. As such, the court adopts Plaintiff's proposed construction of "interactive device." Accordingly, the court construes "interactive device" to mean a "component or machine than can access the first communication network and be used to carry out an interactive activity."

### V.  CONCLUSION

The court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered

to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

It is so ORDERED.

SIGNED this 2nd day of September, 2011.


CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE